UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KRISTINA JOHNSON,

     Plaintiff,

v.                                     CASE NO.: 8:09-cv-2035-T-23EAJ

S.H.S. RESORT, LLC,

     Defendant.

_____/

## ORDER

     The plaintiff sued (Doc. 2) in state court and alleged (1) sexual harassment and

retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, and (2) a violation

of the Florida Private Whistleblower's Act.  The defendant removes (Doc. 1) and moves

(Doc. 17) for summary judgment.  The plaintiff responds (Doc. 22) in opposition.

Background

     In June, 2007, the defendant (the "resort") hired Johnson to work as a server in

the resort's restaurant.[1]  Upon becoming an employee of the resort, Johnson received a

copy of the resort's "employee handbook."[2]  Among other things, the employee

handbook establishes employee "standards of conduct" and delineates the resort's anti-

_____

[1] (Doc. 17-1, at 20)  During her tenure, Johnson received a promotion to "lead server" but later received a demotion for arriving to work late and "visibly drunk."  (Doc. 17-1, Ex. 7)  Johnson again received discipline after arriving forty minutes late for her shift.  (Doc. 17-1, Ex. 8)  For the remainder of Johnson's employment at the restaurant, Johnson worked as a server.

[2] (Doc. 17-1, Exs. 3, 4)

harassment policy.  The policy both prohibits retaliation and describes a procedure for an employee's submitting a complaint of harassment to management.[3]

On Friday, August 1, 2008, a dispute occurred between Johnson and the restaurant's host, Tim Patton.[4]  Before the dispute, Patton and Johnson "were friendly with each other" to the extent (1) that Johnson sometimes drove Patton to work and (2) that Patton and Johnson "would smoke cigarettes together."  Patton and Johnson's relationship changed after the guests at one of Johnson's tables requested martinis with Grey Goose Vodka.  Johnson explained to the guests that, because of the particular vacation package the guests had purchased, a Grey Goose martini would cost extra.[5]  The guests decided instead to order wine.  A short time later, Johnson discovered martinis on the guests' table.  Johnson asked the bartender about the martinis, and the bartender stated that Patton "had authorized [the bartender] to make two Grey Goose martinis for th[e] table."[6]

Later, in the back of the restaurant, Johnson confronted Patton about the martinis.  Johnson decided to confront Patton because Johnson "was upset with it because  . . . [the] table . . . tipped [Johnson] poorly . . . ."  Johnson "explained to [Patton] that [Grey Goose] wasn't part of the package and that the[] [guests] weren't going to pay for it for full price and it wasn't [Patton's] place to go to the table and do

_____

[3] (Doc. 17-1, Ex. 3)

[4] (Doc. 17-1)

[5] (Doc. 17-1)  The resort offers a "Florida get-away package" that includes a special price—one dollar per beverage—for an alcoholic beverage at the restaurant.  The special price applies to "well" or lower priced liquor but not to premium liquor, such as Grey Goose Vodka.

[6] (Doc. 17-1)

that . . . ."  According to Johnson, Patton responded that "it wasn't a big deal" but apologized.[7]  Johnson replied, "I don't accept your apology."[8]  After this conversation, Patton again "tried to apologize or wanted to say something" to Johnson, but Johnson told Patton that she had no time to talk.[9]  Approximately two hours later, Patton collected his belongings from the host stand, walked toward the back of the restaurant, looked "dead into [Johnson's] eyes," and stated that he needed to leave because he could not deal with the "cunts" or "cunt" that work at the restaurant.[10]  Extremely upset by the remark, Johnson reported the incident to her supervisor, Jean Paul Jurilli.

The next evening, Jurilli requested that Johnson and Patton meet to discuss the incident the previous evening.  Johnson first refused to meet unless the resort's general manager, Zachary Frangos, attended, because Johnson "didn't think it was appropriate."  However, Johnson relented because both Johnson and Patton planned to work that night at the restaurant.  Jurilli, Johnson, and Patton convened at a round banquet table near the restaurant's loading dock.[11]  As Johnson later described the meeting:

> I remember [Jurilli] saying that we [Johnson and Patton] needed to
> work together so . . . we had to discuss what happened last night
> and I looked at [Patton] and I was like you had the audacity to call
> me a cunt and expect me to work with you?  And he said I sure did
> call you a cunt and . . . then I don't remember exactly what was said

---

[7] (Doc. 17-1)

[8] (Doc. 17-1)

[9] (Doc. 24, at 58-59)

[10] (Doc. 24, at 56-67)

[11] (Doc. 24, at 75-77)

> after that.  I remember [Patton] getting up and pushing the chair back and approaching me, because we were on opposite sides of the table . . . [Patton] started walking toward[] me and I was still seated at that time or might have just gotten up, and I remember I was just like [to Jurilli] you're not going to stop this?  Like you're going to allow this to keep going?  And [Patton] just kept calling me a cunt and a bitch and . . . a cry baby who should go suck my mother's tit and . . . it wasn't being stopped.[12]

Patton added that Johnson was "fucking crazy" and "should get on Prozac."  Johnson's response consisted of calling Patton "crazy" and "an asshole" and telling Patton to "get out of [her] face."[13]  Johnson cursed and said "'fuck' a few times" to Jurilli.[14]  At one point during the meeting, Jurilli told Patton to calm down.[15]  Jurilli described the meeting as Patton and Johnson screaming at each other.  Patton called Johnson a "bitch," and Johnson called Patton a "pussy."[16]  After the meeting, Patton left the restaurant and never returned to his shift.  Despite Johnson's "hysterically crying" during the meeting, Jurilli required Johnson to stay at the restaurant for her shift that evening.  Jurilli, according to Johnson, told Johnson that she would receive the blame "if anything went wrong that night . . . ."[17]

On Monday, August, 4, 2008, Johnson contacted the resort's human resources manager, Deborah Cooney.  Cooney instructed Johnson to provide a written complaint.

---

[12] (Doc. 24, at 76-77)

[13] (Doc. 24, at 81-84)

[14] (Doc. 24, at 84)

[15] (Doc. 24, at 113)

[16] (Doc. 27, at 41-44)

[17] (Doc. 24, at 81-84)

Upon Johnson's providing Cooney with a written complaint, Cooney told Johnson that Cooney would talk to Frangos and arrange a meeting.  Cooney read the statement but declined to ask Johnson any questions.[18]  Cooney initiated an investigation and, on August 5, 2010, Cooney, Frangos, and Jurilli met to discuss the incidents.  Later, Cooney, Frangos, and Jurilli convened separate meetings with Johnson and Patton. Frangos asked Johnson to explain what happened.  The meeting concluded with Jurilli's notifying Johnson of a three-day suspension without pay pending a full investigation.[19] Patton also received a three-day suspension without pay.[20]  Patton's "disciplinary action form" states that Patton "had a situation with a co-worker and he did not handle [the situation] in a professional manner . . . [r]esulting in [Patton's] walking off the job without proper management approval . . . which is the third time within a couple of months."[21] Johnson's disciplinary action form states that Johnson "was involved in a situation with a co-worker[,] which resulted in [a] verbal confrontation [that] escalated into verbal abuse and disrespect toward[] [a] co-worker and management."[22]

On Friday, August 8, 2010, Cooney continued her investigation by speaking with Joe Miller, a witness identified by Johnson and a "steward supervisor" at the resort, who

---

[18] (Doc. 24, at 90-96)

[19] (Doc. 24, at 90-96) (Doc. 17-1)

[20] (Doc. 25, at 123)

[21] (Doc. 23-7)

[22] (Doc. 17-1, Ex. 10)

observed the confrontation on the loading dock.[23]  On the same day, (1) Cooney

informed Johnson that, pending completion of the investigation, Johnson's suspension

would continue and (2) Johnson resigned from her position at the resort.[24]  Jurilli

expressed regret that Johnson refused to wait for the outcome of the investigation.[25]

However, during her suspension, Johnson had "start[ed] looking for jobs," applied for,

and obtained a position with another employer.  The following week, Johnson started

her new job.[26]  Upon completing the investigation, the resort issued a final warning and

a thirty-day probation to Patton.

Discussion

*1. Hostile Environment Sexual Harassment Under Title VII*

To state a prima facie case under Title VII for sexual harassment, a plaintiff must

show (1) that "she belongs to a protected group," (2) that "she has been subjected to

unwelcome harassment," (3) that "the harassment was based on sex," (4) that "the

harassment was sufficiently severe and pervasive to alter the terms and conditions of

employment and to create a discriminatorily abusive working environment," and (5) that

"a basis exists for holding the employer liable."  Carter v. America Online, Inc., 208 F.

Supp. 2d 1271, 1276 (M.D. Fla. 2001).  An employer faces vicariously liability for sexual

harassment by an employee's co-worker if the employer "knew or should have known

---

[23] (Doc. 23-9)   Miller described the confrontation as Patton "jump[ing] up and [getting] in [Johnson's] face" and Patton and Johnson "arguing back and forth" as Jurilli stood between the two.

[24] (Doc. 24, at 103-112)

[25] (Doc. 24, at 106)

[26] (Doc. 17-1, at 129)

about the harassment [of the employee] and failed to [effect] prompt remedial action."
208 F. Supp. 2d at 1276; Henson v. City of Dundee, 682 F.2d 897, 905 (11th Cir. 1982).
The resort argues that the plaintiff shows neither that the alleged conduct was
sufficiently severe and pervasive to alter the terms and conditions of employment nor
that a basis exists for holding the resort vicariously liable.  Johnson responds (Doc. 22)
(1) that the severity and pervasiveness of the harassment created a discriminatory and
abusive working environment and (2) the resort failed to effect prompt remedial action
and is, therefore, liable for the harassment.

     Sufficiently severe and pervasive harassment—such that a working environment
becomes abusive or hostile—"'involve[s] patterns or allegations of extensive, long
lasting, unredressed, and uninhibited sexual threats or conduct that permeate[] the
plaintiffs' work environment.'"  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 586 (11th
Cir. 2000) (Carnes, J.) (quoting Indest v. Freeman Decorating, Inc., 164 F.3d 258, 264
(5th Cir. 1999)), abrogated on other grounds by Burlington N. & Santa Fe Ry. v. White,
548 U.S. 53 (2006); accord Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798,
804 (11th Cir. 2010) (reversing summary judgment in favor of the employer based on
evidence of offensive conduct that occurred "'on a daily basis'" for three years such that
words like "whore" and "bitch" were "'commonplace.'").  "Title VII does not prohibit
profanity alone, however profane. It does not prohibit harassment alone, however
severe and pervasive. Instead, Title VII prohibits discrimination, including harassment
that discriminates based on a protected category such as sex. . . . [T]he statute does
not enact 'a general civility code.'"  Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d

1287, 1301-02 (11th Cir. 2007) (Carnes, J.); <u>see also</u> <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788-89 (1998) (finding that Title VII excludes from coverage "complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'"). "'Title VII prohibits discrimination; it is not a shield against harsh treatment at the work place. Personal animosity is not the equivalent of sex discrimination . . . . The plaintiff cannot turn a personal feud into a sex discrimination case . . . .'" <u>Succar v. Dade County School Bd.</u>, 229 F.3d 1343, 1345 (11th Cir. 2000) (quoting <u>McCollum v. Bolger</u>, 794 F.2d 602, 610 (11th Cir. 1986)).

The facts of this action, construed favorably toward Johnson, fail to establish a hostile work environment.  Johnson and Patton were friends and congenial co-workers until the evening of August 1, 2008, when Patton interfered with Johnson's table, and Johnson received a poor tip.  Despite first attempting to resolve the situation with an apology, Patton became angry and launched a profanity at Johnson.  In an effort to mediate the dispute, Jurilli succeeded only in exacerbating the feud and igniting a mutual burst of profanity by both Johnson and Patton.  Evident from the allegations and the evidence is the complete absence of harassment redressable under Title VII.  This action consists of a personal dispute over a co-worker's interference in another's job, a poor tip, and mutually unprofessional conduct.  Accordingly, because the plaintiff fails to show severe and pervasive harassment, the plaintiff cannot establish a basis for the resort's liability.

*2. Retaliation Under Title VII*

To establish a prima facie case of retaliation, a plaintiff must show (1) that the plaintiff "engaged in statutorily protected expression," (2) that the plaintiff "suffered an adverse employment action," and (3) that the two events possess some "causal relationship." Holifield v. Reno, 115 F.3d 1555, 1566 (11th Cir. 1997). The "causal link" element receives a broad construction, to the extent that a plaintiff must show merely "'that the protected activity and the negative employment action are not completely unrelated.'" Pennington v. City of Huntsville, 261 F.3d 1262, 1266 (11th Cir. 2001) (quoting Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998)). A defendant rebuts the prima facie case by "articulating a legitimate, nondiscriminatory reason for the adverse employment decision of which the plaintiff complains." Walker v. Mortham, 158 F.3d 1177, 1184 (11th Cir. 1998); see also Matima v. Celli, 228 F.3d 68, 79 (2nd Cir. 2000) ("An employer does not violate Title VII when it takes adverse employment action against an employee to preserve a workplace environment that is governed by rules, subject to a chain of command, free of commotion, and conducive to the work of the enterprise."). The burden then shifts to the plaintiff to show that the employer's reason is merely a pretext for intentional discrimination. Walker, 158 F.3d 1184-85.

An adverse employment action consists of something "that a reasonable employee would have found . . . materially adverse, 'which in this context means it well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" White, 548 U.S. at 68. The employment action receives an evaluation

from the vantage of a reasonable person in the plaintiff's position and under the same circumstances.  548 U.S. at 68-70.  An employment action is "adverse" if the action is "'objectively serious and tangible enough' to alter a plaintiff's 'compensation, terms, conditions, or privileges of employment, deprive . . . her of employment opportunities or adversely affect[ ] . . . her status as an employee.'"  Akins v. Fulton County, Ga., 420 F.3d 1293, 1303 (11th Cir. 2005) (Wilson, J.) (quoting Gupta, 212 F.3d at 588)).

In this instance, the resort concedes (Doc. 17) that Johnson's complaint to Cooney on August 4, 2008, qualifies as a statutorily protected expression.  However, the resort asserts that Johnson establishes neither an adverse employment action nor a causal connection.  Johnson argues (1) that the unpaid three-day (and later indefinite) suspension qualifies as an adverse employment action and (2) that the "temporal proximity" of the complaint and the suspension "is sufficient to create an inference" that the resort suspended Johnson because of Johnson's complaint.  Additionally, Johnson argues that the resort's basis for the adverse employment action is "a mere pretext" for "discrimination/retaliatory intent."

Upon review, the resort's suspension of Johnson fails to qualify as an adverse employment action.  A three-day (and later indefinite) suspension without pay is "objectively serious and tangible enough" to alter Johnson's status as an employee.  However, no reasonable person (from Johnson's vantage) could conclude that the suspension arose from Johnson's August 4 harassment complaint.  Rather, reason dictates that the suspension resulted from Johnson's unprofessional, screaming, profanity-laced response to Patton's unprofessional, screaming, profanity-laced

outburst.  Nonetheless, even assuming Johnson sustained an adverse employment

action, Johnson provides no fact or evidence other than temporal proximity to show a

"causal relationship" between her complaint and her suspension.  Further assuming that

a mere temporal proximity is enough to show a causal relationship—which a "not

completely unrelated" standard (if that amounts to a standard at all) arguably

permits—Johnson provides no evidence that the suspension derived from any

discriminatory intent by the resort.  In fact, the record is replete with evidence of the

resort's legitimate, non-discriminatory basis for the suspension.  The facts establish that

Johnson's suspension arose from her unprofessional behavior toward both her co-

worker and her manager.  Both Johnson's and Patton's conduct on August 2 shows that

neither could work professionally and amicably with the other immediately following the

August 1 dispute.  Permitting the concurrent work of two individuals who lack the

capability to collaborate without screaming and profanity would preclude the resort's

maintaining a civil, placid workplace.  Because Johnson shows no evidence of invidious

motive or intent, Johnson's retaliation claim fails.

Conclusion

The record establishes the complete absence in this action of harassment

cognizable under Title VII.  Although this action presents an unfortunate and

tempestuous episode, this action consists of no more than an isolated outburst by an

angry co-worker and a laudable but unsuccessful attempt by management to ameliorate

the ruptured friendship between Johnson and Patton.  Patton's and Johnson's inability

to behave in a mature, professional manner in disputing the resort's beverage policy

- 11 -

both fails to rise to the level of a federal discrimination claim and amounts to little more than an unexpected, ungoverned, and searing feud.  Accordingly, the resort's motion (Doc. 17) for summary judgment is **GRANTED** as to counts one and two of the complaint (Doc. 2).  The motion for leave to file a reply (Doc. 28) is **DENIED AS MOOT**.  Pursuant to 28 U.S.C. § 1367(c), jurisdiction over the remaining state law claim is **DECLINED**, and this action is **REMANDED** to the Circuit Court for Pinellas County.  The Clerk is directed to (1) enter a judgment in favor of the defendant and against the plaintiff as to counts one and two; (2) mail a certified copy of this order, pursuant to 28 U.S.C. § 1447(c), to the Clerk of the Circuit Court for Pinellas County; (3) terminate any pending motion; and (4) close the case.

ORDERED in Tampa, Florida, on August 30, 2010.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE